UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.	CASE NO. 6:22-cr-55-PGB-EJK

18 U.S.C. § 371

MICHAEL CRAIG CHURCHILL

**INFORMATION**

The United States Attorney charges:

**COUNT ONE**
**(Conspiracy to Defraud the United**
**States and Pay and Receive Kickbacks)**

Introduction

At all times material to this Information:

**The Conspirators and Their Enterprises**

1. MC HEALTH was a purported marketing company incorporated under the laws of Florida, with its principal place of business located in Seminole County, Florida. MC HEALTH maintained an account at Fifth Third Bank ending in 5021 ("MC Health Account").

2. MDC Unlimited Corporation ("MDC") was a purported marketing company incorporated under the laws of Florida, with its principal place of business located in Seminole County, Florida. MDC maintained an account at Wells Fargo Bank ending in 8130 ("MDC Account"). MDC and MC HEALTH operated out of the same location, and MC HEALTH on occasion, utilized the MDC Account to

receive payments.

3. MICHAEL CRAIG CHURCHILL was a resident of Seminole County, Florida, and he owned and controlled MC HEALTH and the MC Health Account.

4. Company 1 was a durable medical equipment ("DME) supply company incorporated under the laws of New Jersey, with its principal place of business located in Ocean County, New Jersey. Company 1 was an enrolled provider with the Medicare Program.

5. Company 2 was a purported telemedicine company, with its principal place of business located in Essex County, Massachusetts. Company 2 purported to provide telemedicine consultations with individuals enrolled in the Medicare Program.

6. Company 3 was a purported pharmacy incorporated under the laws of Texas, with its principal place of business located in Fort Bend County, Texas. Company 3 was an enrolled provider with the Medicare Program.

### The Medicare Program

7. The Medicare Program ("Medicare") was a federal health care program that provided free or below-cost health care benefits to individuals who were sixty-five years of age or older or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received

2

benefits under Medicare were commonly referred to as Medicare "beneficiaries."

## Durable Medical Equipment

8. Orthotic devices were a type of DME that included rigid and semi-rigid devices, such as knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

9. DME companies, physicians, and other health care providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A health care provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

10. Enrolled Medicare providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers were required to abide by the Federal anti-kickback statute and other laws and regulations. Providers were given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations.

11. Medicare reimbursed DME companies and other health care providers for services and items rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or

through a billing company.

12. A Medicare claim for DME reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

13. A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury, prescribed by a licensed physician, and accompanied by a completed prescription for braces and other Medicare-required documents (collectively, "doctors' orders").

### Medicare Part D

14. Medicare Part D subsidizes the costs of prescription drugs for Medicare beneficiaries in the United States. It was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006. Part D benefits are administered by private insurance plans that are funded by Medicare through CMS.

15. Beneficiaries obtain Part D benefits by joining a prescription drug plan operated by private insurance companies (typically called drug plan sponsors) approved by Medicare to administer Part D benefits; or they can join a Medicare Advantage plan that covers both prescription drugs and medical services. Medicare, through CMS, compensates the drug plan sponsors for providing the prescription drug benefit to the beneficiary. Medicare pays the sponsors a monthly fee for each Medicare

beneficiary of the sponsors' plans. Such payments are called capitation fees. The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceeds that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

16. A pharmacy can participate in the Part D program by contracting with the plan sponsors, or their Pharmacy Benefit Managers ("PBM"), which provide Medicare Part D coverage.

17. Pharmacies that enroll as Medicare Part D providers must agree to abide by all Medicare laws, regulations, and program instructions. Providers must further certify that they will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

18. Typically, a Medicare beneficiary enrolled in a Medicare Part D plan fills their prescription at a pharmacy utilizing their Medicare Part D plan coverage to pay for the prescription. The pharmacy then submits the prescription claim for reimbursement to the Medicare Part D beneficiary's plan sponsor or PBM for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan identification number.

19. Usually, a pharmacy submits a number of electronic claims at a time to a Part D plan for payment. Then, the Part D plan sends a reimbursement check to the pharmacy or initiates an electronic transfer of funds to the pharmacy's bank.

20. Under the Social Security Act, Medicare covers Part D drugs that are

dispensed upon a valid prescription and for a "medically accepted indication." 42 U.S.C. § 1395w-102(e). Under the Medicare Prescription Drug Benefit Manual, to be covered by Medicare, "a Part D drug must be used for a medically-accepted indication that facilitates the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Chapter 6, Section 10.6. Medicare generally does not cover drugs meant for prevention of disease, and only covers drugs meant to treat an existing illness or injury.

21. Medicare Part D provides benefits with a copayment structure. A copayment is an out-of-pocket payment that a beneficiary makes for their share of the prescription. The copayment can sometimes be a fixed dollar amount or a percentage of the total prescription cost. Medicare Part D copays are a form of cost sharing that encourages beneficiaries from unnecessary prescription expenses. Medicare allows the waiver of copays only in very limited circumstances.

22. Medicare Part D providers sometimes prescribe antibiotic and antifungal drugs to be used in footbaths (collectively, "footbath medications"). In some cases, such prescriptions are ineffective and in some cases can be harmful to patients.

23. These footbath medications are prescribed, purportedly, to treat a variety of fungal, bacterial, or other types of foot infections. Typical diagnoses used to support these prescriptions include ingrown toenails, cellulitis, diabetic ulcers, sores, and athlete's foot.

## The Conspiracy

24. From in or around March 2019, and continuing through in or around June 2021, in the Middle District of Florida, and elsewhere, the defendant,

MICHAEL CRAIG CHURCHILL,

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the United States, to:

    a.    defraud the United States by cheating the government out of money and property and by impairing, impeding, obstructing, and defeating through deceit, craft, and trickery, the lawful government functions of the HHS, through its agency CMS, in its administration and oversight of Medicare;

    b.    commit an offense against the United States, that is, soliciting and receiving remuneration (kickbacks and bribes), in violation of 42 U.S.C. § 1320a-7b(b)(1); and

    c.    commit an offense against the United States, that is, offering and paying remuneration (kickbacks and bribes), in violation of 42 U.S.C. § 1320a-7b(b)(2).

## Manner and Means of the Conspiracy

25. The manner and means by which the defendant and her conspirators sought to accomplish the purposes of the conspiracy included, among others, the following:

    a.    It was a part of the conspiracy that MICHAEL CRAIG

        CHURCHILL would and did own and control MC HEALTH.

b.    It was further part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did control MDC.

c.    It was further a part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did obtain access to Medicare beneficiaries' patient information from others, including telemarketers, who would and did target them with advertising and induce them to accept DME braces regardless of medical necessity.

d.    It was further a part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did obtain access to Medicare beneficiaries' patient information from others, including telemarketers, who would and did target them with advertising and induce them to accept footbaths regardless of medical necessity.

e.    It was further a part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did identify and convince Medicare beneficiaries into accepting DME.

f.    It was further a part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did identify and convince Medicare beneficiaries into accepting footbaths.

g.    It was further a part of the conspiracy that MICHAEL CRAIG

CHURCHILL and his conspirators would and did pay Company 2 kickback payments in exchange for the issuance of prescriptions authorizing the aforementioned DME.

h. It was further a part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did pay Company 2 kickback payments in exchange for the issuance of prescriptions authorizing the aforementioned footbath medications.

i. It was further a part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did send the Medicare beneficiary information and doctors' orders to Company 1, which would, in turn, bill Medicare.

j. It was further a part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did send the Medicare beneficiary information and prescriptions for footbath medications to Company 3, which would, in turn, bill Medicare.

k. It was further a part of the conspiracy that Company 1 would and did receive Medicare reimbursements for the DME provided to Medicare beneficiaries sourced by MICHAEL CRAIG CHURCHILL and his conspirators.

l. It was further a part of the conspiracy that Company 3 would and did receive Medicare reimbursements for the footbath medications

   provided to Medicare beneficiaries sourced by MICHAEL CRAIG CHURCHILL and his conspirators.

m. It was further a part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did receive a portion of the Medicare reimbursement from Company 1 as a kickback in exchange for recruiting beneficiaries and referring doctors' orders.

n. It was further a part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did receive a portion of the Medicare reimbursement from Company 3 as a kickback in exchange for recruiting beneficiaries and referring prescriptions for footbath medications.

o. It was further part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did receive kickbacks from Company 1 at bank accounts controlled by MDC, including the MDC Account.

p. It was further part of the conspiracy that MICHAEL CRAIG CHURCHILL and his conspirators would and did receive kickbacks from Company 3 at bank accounts controlled by MC HEALTH, including the MC Health Account.

q. It was further a part of the conspiracy that MICHAEL CRAIG CHURCHILL and others would and did disguise the nature and

   source of these kickbacks and bribes by entering into sham contracts that falsely described the payments as compensation for "marketing" services.

r.  It was further a part of the conspiracy that MICHAEL CRAIG CHURCHILL and others would and did submit, and cause the submission of, false and fraudulent claims to Medicare for medically unnecessary DME and footbath medications procured through the payment of kickbacks and bribes, in the approximate amount of $2,040,878.21.

### D.  Overt Acts

19.  In furtherance of the conspiracy and to accomplish its objects and purpose, the conspirators committed and caused to be committed, in the Middle District of Florida, and elsewhere, the following overt acts, among others:

 a.  On or about November 20, 2020, MICHAEL CRAIG CHURCHILL and his conspirators, through MC HEALTH, solicited and received approximately $3,850 in the form of illegal kickbacks and bribes from Company 1, which were deposited into the MDC Account.

 b.  On or about November 27, 2020, MICHAEL CRAIG CHURCHILL and his conspirators, through MC HEALTH, solicited and received approximately $4,025 in the form of illegal kickbacks and bribes from Company 1, which were deposited into

the MDC Account.

c. On or about November 20, 2020, MICHAEL CRAIG CHURCHILL, and his conspirators, through MC HEALTH, offered and paid approximately $850 in the form of illegal kickbacks and bribes to Company 2, which were paid from the MC Health Account.

d. On or about November 27, 2020, MICHAEL CRAIG CHURCHILL and his conspirators, through MC HEALTH, offered and paid approximately $935 in the form of illegal kickbacks and bribes to Company 2, which were paid from the MC Health Account.

e. On or about September 20, 2020, MICHAEL CRAIG CHURCHILL and his conspirators, through MC HEALTH, solicited and received approximately $13,750 in the form of illegal kickbacks and bribes from Company 3, which were deposited into the MC Health Account.

f. On or about October 18, 2020, MICHAEL CRAIG CHURCHILL and his conspirators, through MC HEALTH, solicited and received approximately $20,500 in the form of illegal kickbacks and bribes from Company 3, which were deposited into the MC Health Account.

All in violation of 18 U.S.C. § 371.

## FORFEITURE

1. The allegations contained in Count One are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

2. Upon conviction of a conspiracy to violate 42 U.S.C. § 1320a-7b(b), in violation of 18 U.S.C. § 371, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the offense.

3. The property to be forfeited includes, but is not limited to, the $252,050 in proceeds the defendant obtained as a result of the commission of the offense.

4. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

ROGER B. HANDBERG
Acting United States Attorney

JOSEPH S. BEEMSTERBOER
Acting Chief
Criminal Division, Fraud Section
Department of Justice

_____
Alejandro J. Salicrup, Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section

_____ for
Chauncey A. Bratt
Assistant United States Attorney
Deputy Chief, Orlando Division